1

362rpur1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    PURDUE PHARMA L.P., et al.,              Trial

3
                        Plaintiffs,          00 Civ. 8029 (SHS)
4           v.                               01 Civ. 2109 (SHS)
                                             01 Civ. 8117 (SHS)
5   ENDO PHARMACEUTICALS, INC.,

6                       Defendant.
    ------------------------------x          New York, N.Y.
7                                            June 2, 2003
                                             10:00 a.m.
8   Before:
            HON. SIDNEY H. STEIN
9                                            District Judge

10

                    APPEARANCES
11

12    FISH & NEAVE
      Attorneys for Plaintiffs
13          1251 Avenue of the Americas
            New York, New York 10020
14          (212) 596-9000
      BY:  HERBERT F. SCHWARTZ, ESQ.
15         ROBERT J. GOLDMAN, ESQ.
           GERALD J. FLATTMANN, JR., ESQ.
16         DENISE L. LORING, ESQ.
           RICHARD A. INZ, ESQ.
17

      SKADDEN ARPS, SLATE, MEAGHER & FLOM, LLP
18    Attorneys for Defendant
      Four Times Square
19          New York, New York  10036-6522
            (212) 735-3000
20    BY:  EDWARD V.FILARDI, ESQ.
           CONSTANCE S. HUTTNER, ESQ.
21         DOUGLAS R.NEMEC, ESQ.

22    KRAMER LEVIN NAFTALIS & FRANKEL LLP
      Attorneys for Defendant
23          919 Third Avenue
            New York, New York  10022
24          (212) 715-9207
      BY:  NICHOLAS L. COCH, ESQ.
25         DONALD L. RHOADS, ESQ.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

362rpur1

2

1        (Case called)

2        THE COURT:  Good morning all.  This is the trial of

3   Purdue v. Endo, three cases, 00 Civ. 8029, 01 Civ. 2109, and 01

4   Civ. 8117.

5        I would like to handle some housekeeping matters

6   first.  The first thing, I believe I made this disclosure at

7   the very first time we met.  But just so the record is

8   completely clear, and it is a disclosure I made at the trial of

9   the prior case as well, an employee of Purdue Pharma formerly

10  was an associate at my former firm, then known as Stein

11  Zauderer Ellenhorn Frischer & Sharp.  He left Stein Zauderer

12  before I did, so my guess is that was at least ten years ago.

13  His name is Richard Silber.  I believe he is still an employee,

14  he is an attorney, an employee of Purdue Pharma.

15        I can adopt the matters that the parties have arrived

16  at and agreed to in the letters dated May 23 and May 31, which

17  really are procedural matters.  The May 23rd letter is from Mr.

18  Schwartz, setting forth the fact that cross won't be limited to

19  the scope of direct where the person would have been called by

20  the other side.  Then, no need for a subpoena for the

21  production of employees and agents of the parties, and so

22  forth.  I have no problem with that.

23        Similarly, I have copies of letters dated May 30 and

24  May 31, which really are letters between counsel, but they set

25  forth agreements on similar matters, and I have no problem with

1           THE COURT:  Wait just a moment.

2           MR. FLATTMANN:  Certainly.

3           THE COURT:  I understand.  You are talking about

4  OxyContin.  You aren't referring to the drug oxycodone but to

5  the product, the commercial product OxyContin?

6           THE WITNESS:  Yes.

7           THE COURT:  All right.

8  Q.  What effect would increasing the amount of oxycodone in the

9  combination products have on the duration of pain relief that

10 they afford?

11 A.  Really very little effect.  It might increase the duration

12 a half hour or so, but not beyond that four to six-hour period.

13 Q.  Why is that?

14 A.  Because it is formulated in immediate-release formulations.

15 The drug is released from the formulation and the duration is

16 short.

17 Q.  Now let me ask you a different question.  What effect would

18 increasing the amount of either aspirin or acetaminophen in

19 these combination products have on the duration of pain relief

20 that they afford?

21 A.  Again, it might increase the duration marginally, but again

22 not beyond six hours or so.

23 Q.  Would increasing the amount of aspirin or acetaminophen in

24 these combination products have any other effects?

25 A.  Potentially, yes.  These drugs, aspirin and acetaminophen

1   have maximum or ceiling dosages that are safe to give in a 24-

2   hour period, particularly when patients take these medications

3   on a 24-hour basis.

4   Q.  Why do they have ceiling dosages?

5   A.  It is a property of their pharmacology, that there is just

6   a dose that you can't go beyond and get additional analgesia,

7   or pain relief.

8   Q.  What happens if you go beyond the ceiling dose?

9   A.  If you go beyond the ceiling dose, you don't get any

10  benefit in terms of increasing the analgesia.  You may get a

11  slight benefit of duration.  But you can put the patient at

12  risk for kidney or liver toxicity if they take the drugs over

13  many days or weeks.

14  Q.  Does OxyContin have any effect on the liver or kidneys?

15  A.  No.

16  Q.  Let me ask you to please turn to your next graphic.  You

17  made reference to that this case relates to controlled-release

18  oxycodone formulations that produce certain blood plasma

19  concentrations of the drug at certain times.  Let's start with

20  the term "blood plasma."  What is blood plasma?

21  A.  "Blood plasma" refers to the liquid portion of the blood.

22  Q.  How are blood plasma concentrations of a drug described?

23  A.  They are described in units of concentration typically,

24  like milligrams per milliliter or nanograms per milliliter,

25  those names.

362rpur3                              Payne - direct                                86

1   Q.   Let me ask you to please turn to your next graphic.   What

2   are you depicting here?

3   A.   I am attempting to define the medical term

4   "pharmacokinetics."   One way to think about that is it is what

5   the body does to the drug.   A more precise definition is that

6   pharmacokinetics is the blood plasma concentration of the drug

7   in the body over time.

8   Q.   You used the abbreviation "PK" on the chart.   What does

9   that stand for?

10  A.   "PK" stands for pharmacokinetics.

11  Q.   Let me ask you to please turn to your next graphic.   Dr.

12  Payne, what are you showing here?

13  A.   An attempt to show the release of drug from a controlled-

14  release formulation as it moves through the gastrointestinal

15  tract.

16  Q.   Could you show the video you prepared.

17  A.   Yes.   As the pill moves from the esophagus into the

18  stomach, it begins to be absorbed, and the blue dots represent

19  drug coming out of the formulation.   It then moves from the

20  stomach into the small intestinal tract.   Again, the drug is

21  released from this formulation slowly.   Then, finally, the drug

22  will move from the small intestine to the large intestine, and

23  drug continues to be released from the formulation.   So there

24  is a continuous slow release of drug from the intestinal tract,

25  from the stomach through the large intestine.

362rpur5                          Kaiko - direct                          165

1   and I had the opportunity to be part of it and I became part of

2   it.

3   Q.   What did you do after you completed your post-doc?

4   A.   Well, things were really kind of just a flow over a period

5   of years, working with the post-doctorate program for a couple

6   of years while setting up a laboratory in Memorial

7   Sloan-Kettering.   And then, after a few years, while still

8   maintaining the laboratory, I became much more involved in

9   clinical studies, their design and analysis and oversight and

10  reporting of the clinical studies that the group was doing over

11  the period of that decade.

12  Q.   What was the general subject matter of your studies at

13  Sloan-Kettering?

14  A.   These were efficacy studies, where we looked at the potency

15  of various analgesics, we looked at their onset, the duration

16  of effect.   We looked at the blood levels of analgesics.   We

17  tried to relate blood levels to effect.   I also spent some

18  considerable time looking back at studies that had been done

19  before I got there, as well as working with the ongoing

20  clinical research program.

21  Q.   What analgesics did you work with primarily at Sloan

22  Kettering?

23  A.   We worked with quite a few, both directly and indirectly.

24  I don't know that I could count them on two hands or three

25  hands or four hands.   Most often, a new analgesic would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   compared in our studies to morphine.  So I guess in a way I

2   learned more about morphine than I did any other particular

3   analgesic that we were testing relative to morphine.

4   Q.  Have you authored or co-authored any published papers about

5   the treatment of pain?

6   A.  Yes, I have.

7   Q.  Approximately how many?

8   A.  Nearly a hundred full manuscripts and nearly 200 abstracts

9   of studies.

10  Q.  Are you a named inventor on any patents besides the three

11  patents in suit?

12  A.  Yes, I am.

13  Q.  Approximately how many?

14  A.  I think about ten patents in addition to the three patents

15  in suit.

16  Q.  Do any of these patents involve advances in pain

17  management?

18  A.  Yes.  They all do.

19  Q.  When did you leave Sloan-Kettering?

20  A.  I left Sloan-Kettering in September of '85.

21  Q.  What did you do after you left?

22  A.  I joined Purdue.

23  Q.  What was your job title when you first went to Purdue?

24  A.  Associate medical director.

25  Q.  What were your responsibilities as associate medical

1    director?

2    A.   My initial responsibilities when I just joined Purdue was

3    to oversee the clinical research activities involving the

4    currently marketed opioid analgesics -- analgesics in general

5    rather.   I participated in medical education activities,

6    particularly lecturing, and I also had responsibility for

7    responding to medical inquiries from health professionals who

8    were called in or wrote in with questions about pain management

9    or analgesics.

10   Q.   Has your job changed over time?

11   A.   My job changed to some extent.   My responsibilities for

12   clinical research went beyond analgesics into most of other

13   areas that we were involved in.   By 1990 I had responsibility

14   for, as the vice president of clinical research, most all of

15   the clinical research program.

16   Q.   What products, if any, did you have responsibility for when

17   you first arrived at Purdue?

18   A.   When I very first arrived, I had responsibility for MS

19   Contin and another analgesic, a nonopioid analgesic.

20   Q.   What is MS Contin?

21   A.   MS Contin is controlled-release form morphine sulfate.

22   Q.   Did there come a time when you proposed that Purdue develop

23   a new controlled-release opioid analgesic?

24   A.   Yes.

25   Q.   Which opioid did you propose?

1   A.   Controlled-release oxycodone.

2   Q.   When did you make that proposal?

3   A.   Very shortly after I first arrived.

4   Q.   And to whom did you make it?

5   A.   Dr. Richard Sackler.

6   Q.   Who was Richard Sackler?

7   A.   He is one of the owners of Purdue.

8   Q.   Why did you propose to develop a new opioid analgesic?

9   A.   To really make up for the deficits that were obvious with

10  MS Contin.

11  Q.   What were the shortcomings of MS Contin that you were aware

12  of?

13  A.   MS Contin, while it controlled pain when dosed every 12

14  hours in most patients, there remained to be some patients in

15  whom you couldn't provide pain control with every 12-hour dose

16  and you had to dose more frequently.

17          THE COURT:  What year was this when you approached

18  Richard Sackler?  You said it was shortly after you --

19          THE WITNESS:  Very shortly after I arrived.  It was

20  still '85.

21  Q.   Was this shortcoming, in your view, a result of the

22  morphine itself or the controlled-release nature of the

23  morphine?

24  A.   That aspects of the problem with MS Contin were due to MS

25  Contin and the particular delivery system it was in.  It was of

1    MS Contin rather than morphine itself.

2    Q.   How did you propose to address this shortcoming?

3    A.   The hope was that with the right drug and the right

4    controlled delivery system, we could have levels in blood

5    sustained more than the levels of morphine are sustained with

6    MS Contin dosing.   The hope was that with sustaining the levels

7    more, we could have more patients capable of being managed with

8    every 12-hour dosing rather than more frequent dosing.

9    Q.   Were there shortcomings associated with the use of MS

10   Contin related to the morphine itself?

11   A.   Yes.

12   Q.   What were those?

13   A.   Morphine is a difficult drug to use well.   To get the dose

14   right, it requires substantial titration, and that had become

15   clear.   Titration is not something that a lot of healthcare

16   professionals can take the time to do; and even when they do

17   take the time to do well, it takes time.   It is something that

18   clearly needed improving upon, if possible.

19          Part of the titration process involved side effects.

20   So side effects were a problem clearly with morphine as well,

21   and there was hope that we could improve upon that.

22   Q.   Could you please explain to the Court what you mean when

23   you use the word "titration."

24   A.   Titration is adjusting the dose to one that provides

25   acceptable pain control without unacceptable side effects.

362rpur5                         Kaiko - direct                         170

1   Q.   What property of morphine, in your view, led to the need

2   for substantial titration?

3   A.   The low oral bioavailability of oral morphine.

4   Q.   Briefly, what do you mean by "oral bioavailability"?

5   A.   Oral bioavailability is the degree to which a drug becomes

6   available in the bloodstream for interaction with the opiate

7   receptors in the brain and spinal cord after it gets absorbed,

8   after it passes through the liver and gets metabolized.

9   Q.   How did you come to understand these shortcomings of MS

10  Contin?

11  A.   Over a period of years at Memorial dealing with morphine

12  and then later on at Memorial dealing with oral morphine and

13  eventually MS Contin in the context of that experience over

14  that period of time, I became aware of these things.

15  Q.   Why did you propose the controlled-release oxycodone

16  product for development by Purdue?

17  A.   I felt it could improve pain management, that it would be

18  able to address, potentially if not in fact, these problems.

19  Q.   How did you propose that your controlled-release oxycodone

20  product would improve pain management?

21  A.   By really a combination of the attributes of oxycodone,

22  which were unique to oxycodone relative to other opioid

23  analgesics, combined with a delivery system that would present

24  the product in a certain profile in blood.

25  Q.   How many different opioids did you consider before you

362rpur5                          Kaiko - direct                          171

1   settled on oxycodone for development?

2   A.   Between 15 and 20.

3   Q.   What were the properties of oxycodone that led you to

4   select it over the other opioids that you considered?

5   A.   The properties of oxycodone included the fact that there

6   were certain things that we knew about it.  It was a known

7   entity to a certain extent.  We knew that it was effective when

8   dosed properly.  We had reason to believe that it had a high

9   oral bioavailability and a short elimination half-life.  Those

10  were among the properties.

11  Q.   What are the benefits of a short elimination half-life?

12  A.   What that really means, it means the drug is turned over

13  fairly rapidly in the body and allows a doctor to determine

14  whether or not the dose he prescribed is the right dose and to

15  change that dose relatively quickly if needed.

16  Q.   You also mention that had oxycodone had high oral

17  bioavailability.  Did you consider the relative oral

18  bioavailability of oxycodone compared to morphine?

19  A.   Yes.  Yes, I did.

20  Q.   I would like you to look at Plaintiff's Exhibit 1060, which

21  is in volume 3, but we are putting it up on the screen.  Is

22  that an exhibit that you prepared?

23  A.   Yes, it is.

24  Q.   Please explain how the two drugs, morphine and oxycodone,

25  compare, in your view.

1   A.  This illustrates two ways in which they differ upon

2   comparison.  As I said, morphine, over on the left, has a low

3   oral bioavailability.  We see on the axis on the left labeled

4   "Range of Oral Bioavailability."  So morphine has relatively

5   low oral bioavailability.  Oxycodone, on the other hand, has

6   relatively high oral bioavailability.  So that is one aspect in

7   which they differ.

8           The second aspect, which is a critical one and which

9   is an insight that is absolutely critical to the invention, is

10  that the range around the oral bioavailability of oxycodone had

11  to be narrower than the range around the oral bioavailability

12  of morphine.

13  Q.  What effect, if any, did you believe that these differences

14  in oral bioavailability would have on your controlled-release

15  oxycodone product?

16  A.  I believe that in the right delivery system, controlled-

17  release oxycodone would be able to provide for a narrower range

18  of daily dosages.

19  Q.  Was your belief part of the conventional wisdom in the

20  field at the time?

21  A.  No.  No, it wasn't.

22  Q.  Please explain.

23  A.  While we knew that the oral bioavailability of morphine was

24  low and there was good reason to believe that the oral

25  bioavailability of oxycodone was high, I don't think anybody

1    recognized at the time, certainly my literature searches did

2    not turn it up, that the variability around oxycodone's oral

3    bioavailability would be narrower than the range around

4    morphine's oral bioavailability.  I also think that no one

5    thought about how this could result in narrow range of daily

6    dosages.

7    Q.  When did you have this insight with respect to narrower

8    range of oral bioavailability and also narrower ranges of

9    dosages to control pain?

10   A.  By the time I arrived at Purdue, I had that idea.

11   Q.  Did there come a time when you reviewed data that supported

12   your insight?

13   A.  Yes.

14   Q.  What data did you review?

15   A.  I reviewed individual patient daily dosages in patients who

16   had been titrated with MS Contin to a daily dose that

17   controlled pain without unacceptable side effects.  These were

18   data that Purdue had generated over a period of years that I

19   had access to, that I began analyzing quantitatively.

20   Q.  Have you prepared an exhibit to help demonstrate your

21   analysis of this data?

22   A.  Yes, I have.

23   Q.  I would like you to look, please, at Plaintiff's Exhibit

24   1061.  Is this the exhibit you prepared?

25   A.  Yes, it is.

362rpur5                    Kaiko - direct                    174

1    Q.  Please explain what the data show you with respect to MS

2    Contin.

3    A.  On the x-axis, the bottom axis, we have the dosage, that

4    is, the daily dosage.  On the ordinate we have number of

5    patients.  The data that I had access to I plotted on this type

6    of graph.  What it resulted in is a distribution, frequency

7    histogram, whatever you want to call it, a relationship that is

8    diagrammatically illustrated here in the solid orange line

9    labeled "MS Contin," that line showing the wide, wide range.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

362APUR6                          Kaiko - direct                          175

1  Q.  What did the data show you with respect to that range?

2  A.  The range was very wide.  It quantitated for me what I had

3  as an impression an idea of earlier and really made it clear,

4  clearer, that this is an area that if improved could be a major

5  contribution to pain management.

6             MR. FILARDI:  Objection, your Honor, with regard to

7  foundation of this exhibit.  Obviously it's something we can do

8  on cross-examination, but it might be helpful for your Honor to

9  know what it is that's the basis for the creation of this

10 demonstrative evidence.  This is supposed to be demonstrative.

11            THE COURT:  I'll let you do it on cross.

12            MR. FILARDI:  Thank you.

13            MS. LORING:  I'm sorry, your Honor.  I didn't hear

14 what you said.

15            THE COURT:  He can do it on cross if he wishes,

16 inquire into the basis of the demonstrative.

17 BY MS. LORING:

18 Q.  Dr. Kaiko, this indicates an 8-fold range for MS Contin.

19 Can you explain how you calculated that range?

20 A.  Yes.  I eliminated the extremes, the extreme 10 percent of

21 the patients, so I was left with 90 percent of patients by

22 eliminating the extremes in terms of the daily dose, and then I

23 looked and saw what I had, and what I had wound up with there

24 was an 8-fold range of daily dosages.

25 Q.  What does the exhibit show with respect to controlled-

1   release oxycodone, or your proposed controlled-release

2   oxycodone product?

3   A.   What this exhibit shows is that the controlled-release

4   oxycodone product would have a different distribution.   It

5   would be a narrower distribution.   Being narrower, it would

6   have of course a higher peak, and an approximate 4-fold range.

7   And this, graphed here as a dash line, this was an insight I

8   had at this time, given the other things that I knew and the

9   other insight I had.   And the bottom line here is that the

10  controlling oxycodone product that he envisioned that I

11  targeted would have an approximate 4-fold range and given

12  dosages required to control pain in about 90 percent of

13  patients.

14  Q.   What was the basis for your reaching this conclusion as to

15  the 4-fold range for controlled-release oxycodone?

16  A.   This was based again on my -- the insight that I talked

17  about earlier, that is, the range in oral bioavailability

18  having to be much narrower for oxycodone, as compared to the

19  wider one for morphine, combined with the other attributes of

20  oxycodone, the effectiveness, the short elimination half-life,

21  and this profile of blood levels that I had in mind.

22  Q.   How did you envision that this narrower rate of dosages

23  required to control pain would affect the titration of THE

24  proposed controlled-release oxycodone product?

25  A.   That it would provide for -- there are all kinds of ways

1    that one could express it.  I chose, as an endpoint, daily dose

2    range, but what leads into that are things like time to stable

3    pain control and ease of titration defined a number of

4    different ways.  There are a number of different ways it could

5    express itself.

6    Q.  You stated earlier that shortly after you arrived at Purdue

7    you told Richard Sackler of your idea, your proposal.  What is

8    your understanding of what happened after you made your

9    suggestion to Richard Sackler?

10   A.  I recall that Dr. Sackler had thought it was a good idea

11   and he went about progressing that program.

12   Q.  Did there come a time when you discussed your idea for a

13   controlled-release oxycodone product with others at Purdue?

14   A.  Yes.

15   Q.  What were the circumstances of these discussions?

16   A.  Those discussions were part of the routine -- I guess they

17   were monthly at that point -- R&D meetings.

18   Q.  Who attended these meetings?

19   A.  Ben Oshlack, oftentimes other people from this formulations

20   group.  I always attended those.  Paul Goldenheim always

21   attended those.  Richard Sackler sometimes attended those

22   Eventually Mark Chasin attended those.  Other people in

23   non-clinical research, as well as clinical research,

24   participated in those meetings as well.

25   Q.  Who was Ben Oshlack?

1   A.  Ben Oshlack has led up the formulations group for a long

2   time now.

3   Q.  And who was Paul Goldenheim?

4   A.  At that time Paul Goldenheim was a medical director.

5   Q.  What did you say about your idea for a controlled-release

6   oxycodone product?

7   A.  What I tried to express very early on was that what I had

8   in mind was a product that would have a certain profile of

9   blood plasma concentrations over time, and what I was looking

10  for and which I expressed early on is I wanted something with

11  an early peak, with a peaky kind of initial profile of blood

12  levels, rather than a flat curve.  But I wanted these

13  sustained.  I wanted these sustained but yet being peaky early

14  on.

15  Q.  Was there any discussion about how to achieve the blood

16  level profile that you envisioned for the product?

17  A.  Yes.  There was discussion early on about starting by

18  matching the initial portion of the dissolution curve for MS

19  Contin, trying to match the initial portion of the dissolution

20  curve for MS Contin with the controlled-release oxycodone test

21  formulations.

22  Q.  What does the term "dissolution profile" mean?

23  A.  "Dissolution profile" is an in vitro test that formulators

24  often use early on in the development programs of test

25  formulations, experimental formulations of controlled-release

362APUR6                          Kaiko - direct

1    products.  It's a benchtop way of looking at how the tablet

2    produces drug over time in vitro.

3    Q.  What was your understanding of why there was a decision

4    made to try to match the early portion of MS Contin as a

5    dissolution profile?

6    A.  MS Contin had an early -- was early -- was peaky early on,

7    and that part of the MS Contin averaged -- I mean, there was a

8    lot of variability in blood levels, but it was clear that it

9    had an early rise in blood levels.  And that part of MS Contin

10   I wanted to keep.  I thought that the way to start, with an

11   experimental Oxy -- controlled-release oxycodone formulation

12   was to start with an experimental tablet that would match the

13   initial portion of the dissolution curve.  It made more sense

14   than starting anywhere else.

15   Q.  What happened after you explained your idea to others at

16   Purdue?

17   A.  Well, they were well accepted, and the first move and the

18   move that made sense was that of the formulators, and they went

19   and began formulating experimental controlled-release oxycodone

20   tablets.

21   Q.  Were you apprised of the formulators' progress in this

22   regard?

23   A.  Excuse me?

24   Q.  Were you apprised of the progress of the formulators?

25   A.  Yes.

1  Q.  Did there come a time when you began clinical testing of

2  controlled-release oxycodone formulations?

3  A.  Yes.

4  Q.  When was that?

5  A.  That was in 1987.

6  Q.  What involvement if any did you have in the selection of

7  formulations to be used in clinical studies?

8  A.  I participated in the choice of experimental formulations

9  for that initial study.

10  Q.  I would like to talk now about the types of clinical

11  studies that you've been involved with during the development

12  of OxyContin and other drugs.  Have you prepared a

13  demonstrative exhibit describing --

14  A.  Yes, I have, yes.

15  Q.  -- the different categories of clinical study?

16  A.  Yes.

17  Q.  I'll show you Plaintiff's Exhibit 1062, which is actually a

18  board.  It's also in volume 3 of the exhibit books.

19  A.  Thank you.

20  Q.  Is this the board you prepared, Dr. Kaiko?

21  A.  Yes, it is.

22  Q.  What is the first type of study depicted on the board?

23  A.  The first type of study is a single-dose study which is

24  designed primarily to look at blood levels.

25  Q.  What types of patients are these studies conducted in?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Yes.

2    Q.   Have you prepared demonstrative exhibits to demonstrate the

3    source of some of the language from the '912 patent?

4    A.   Yes.

5    Q.   I would like you to look, please, at Plaintiff's exhibits

6    1065 and 1066.  These are demonstratives that are in volume 3

7    of your book.  Can you explain, please, to the Court what the

8    highlighting is that's in both of these documents.

9    A.   The highlighting in these documents show the text from my

10   invention disclosure that is taken verbatim and incorporated

11   into the written patent.

12   Q.   And there are also some numbers in the margin.  Will you

13   please explain the significance of the numbers.

14   A.   Yes.  If one looks at the invention disclosure at the

15   highlighted areas, each paragraph in that document is numbered.

16   If you go over, then, to the '912 patent, those highlighted

17   areas that are taken from the invention disclosure have the

18   same number in them corresponding to the invention disclosure.

19         So while major sections of the invention disclosure

20   are in the patent -- not in the exact same order, but we've

21   noted them and coded them so that you can see where in fact

22   they appear.

23   Q.   Let's look back at the exhibit, the patent, which is

24   Plaintiff's Exhibit 8.  And I'm going to put on the screen

25   column 1.  I would like you to focus on lines 9 through 17.

1   There's a reference there to "surveys of daily dosages,"

2   "required to control pain."  Do you see that?

3   A.  Yes, I do.

4   Q.  To what does that refer?

5   A.  That refers to the survey that I described yesterday where

6   I examined individual patient MS Contin daily dose requirements

7   to control pain from a series of separate studies and over a

8   period of a couple, few years, and plotted out on a

9   distribution or frequency histogram graph the number of

10  patients that required various doses.

11  Q.  Turn now, please, to column 3.  I would like you to focus

12  on lines 33 through 40.  The paragraph starts "it has now been

13  surprisingly discovered."  To what does this paragraph refer?

14  A.  This paragraph again refers to my insight that a reduced

15  range of daily dosages were required in a majority of patients

16  as compared to twice the range with the prototype analgesic for

17  these kinds of patients.

18  Q.  Which is?

19  A.  MS Contin.

20  Q.  What if anything does this statement say about whether you

21  had proved this four-fold range through clinical studies?

22  A.  Nothing, in terms of scientific proof.

23  Q.  At the time that the '912 patent application was filed, did

24  you have any scientific proof that there was a reduced range

25  with OxyContin?

1    A.   No.

2    Q.   Then what was the basis for this statement?

3    A.   It was based on the insights I had, combining those

4    insights, and knowing that in the context of a certain type of

5    controlled-release profile, with oxycodone this had to be the

6    case.

7    Q.   At the time that the application for the '912 patent was

8    filed, did you believe that this statement was true?

9    A.   Yes.

10   Q.   Do you believe it today?

11   A.   Yes.

12   Q.   I would like you to look now at column 5 of the patent.

13   There's a paragraph that starts at about line 5.  First I would

14   like you to focus on lines 5 to 9 and tell me what's discussed

15   there.

16   A.   What's discussed there is the fact that, at the time, in

17   this area of controlled-release dosage forms, that provide for

18   the 12 hours' effect, the idea that most people had was to

19   produce that steady state of a flat, essentially a flat curve,

20   that that was the goal.  And a flat curve typically has its

21   maximum concentration at between four and eight hours.

22   Whereas --

23   Q.   Let's --

24   A.   Right.

25   Q.   Let's look now at the next piece of that paragraph, lines 9

1  blood levels are more consistent.  In addition to that, what

2  this is saying is that if a doctor chooses a certain dose of

3  OxyContin or doubles a dose of OxyContin in a particular

4  patient, the doctor could be much more confident, five times

5  more confident, in knowing what the concentration of drug is

6  going to be, as compared to if he was using MS Contin.

7  Q.  Are these conclusions consistent or inconsistent with your

8  insight as to the narrower dosage range for your CR oxycodone

9  invention over CR morphine?

10  A.  It is consistent.  It is a clear reflection of the

11  invention.

12  Q.  Now I would like you to look at the third full paragraph

13  under "Conclusions," and the second sentence, which says, "The

14  median time to achieve stable pain control was two days with

15  both treatments, and the number of dose adjustments required

16  and rescue medication use were similar for both drugs."

17          How does this statement affect your belief or your

18  insight into the reduced range of dosages needed with your

19  controlled-release oxycodone invention?

20  A.  This statement does not alter my insight.

21  Q.  Can you explain that, please.

22  A.  Yes.  Again, this study was designed with a different

23  purpose in mind, and it was well controlled for that purpose.

24  That purpose was determining parameters related to blood levels

25  and their fluctuation.  The study was not designed to look at

1   this outcome of these ease of titration.  It didn't have

2   validated methods or procedures, it didn't have the appropriate

3   treatment controls.  The number of subjects were also not

4   chosen on the basis of this kind of outcome.

5          Those in the area of analgesiology would know by the

6   design of this study that that would be the case, and that what

7   we are just looking at here is a characterization of what is

8   happening with these patients before the true experiment is

9   being done.

10  Q.  I would like you to turn now to P187369, under the heading

11  "Study Population."  Tell us how many patients participated in

12  this study.

13  A.  I'm sorry.  Which page?

14  Q.  It is P187369.  I believe the information is in the second

15  paragraph under the heading "Study Population."

16  A.  There were about 50 patients in each of the two treatment

17  groups.

18  Q.  Did you believe that about a hundred patients were

19  sufficient to test ease of titration?

20  A.  No.

21  Q.  Again, how many patients would be needed?

22  A.  I would estimate, without going through the calculations,

23  that hundreds to thousands of patients would be required.

24  Q.  Were you aware of these two studies, the Kalso and

25  Mucci-LoRusso studies during at least some of the applications

1  that led to the patents in suit?

2  A.  Yes.

3  Q.  Are you aware that inventors have a duty to tell the patent

4  office about any information that they know of that is

5  inconsistent with statements they make about their invention?

6  A.  Yes.

7  Q.  Did you tell the patent office about these studies?

8  A.  No.

9  Q.  Why not?

10  A.  They didn't either prove or disprove the invention.  In

11  fact, the results from both these studies were quite consistent

12  with my insights and the invention.  The purposes for which

13  these studies were designed, the results of these studies

14  demonstrate, were fulfilled and quite consistent with the

15  invention.  There was nothing inconsistent to bring to

16  anybody's attention.

17  Q.  Dr. Kaiko, did you intend to deceive the patent office when

18  you told them about your reduced range of daily dosages with

19  your controlled-release oxycodone invention?

20  A.  No.

21          MS. LORING:  I have no further questions, your Honor.

22          THE COURT:  Thank you.  Let's take a ten-minute break.

23          (Recess)

24          THE COURT:  Dr. Kaiko, before we begin

25  cross-examination, you said that, if I understood you

363rpur2                          Kaiko - direct

1    correctly, to test ease of titration, either of these two

2    studies that we have been talking about, the Kalso study and

3    the other one, would require hundreds, even thousands, of

4    participants, is that right?

5            THE WITNESS:  That would be my estimate without going

6    through the calculations, yes.

7            THE COURT:  If the study group for each of them

8    consisted of hundreds or thousands, could ease of titration be

9    gathered from the studies as conducted?  In other words, is the

10   only thing lacking the proper number of subjects?

11           THE WITNESS:  No.  There are two other things that are

12   lacking.  One are control treatments.  One will want to have a

13   treatment that on one extreme and another treatment on the

14   other extreme, two different treatments that the medical

15   community agree have different ease of titration.

16           The ability of the study to demonstrate that there is

17   a difference in titratability between that negative standard

18   and that positive standard would be a measure of the

19   sensitivity of the study.  Once having established that, then

20   you could look at the two items of interest within the study,

21   which is ease of titration with MS Contin and OxyContin, and

22   make statements as to whether or not the study was sensitive

23   enough to determine whether or not differences existed.

24           So in addition to the numbers of the patients, a

25   second issue is control treatments.

1    Contin with experimental formulations of controlled-release

2    oxycodone.

3    Q.   Have you ever used the term, you wanted the formulators to

4    mimic the dissolution profile of MS Contin?

5    A.   That sounds familiar.

6    Q.   Is this something that derives from you?  You said you were

7    the -- I don't recall your exact words but you said that you

8    were basically the driving force, the initiator of the whole

9    project for what eventually became OxyContin; isn't that

10   correct?

11   A.   That's correct.

12   Q.   And my question to you is, do you recall in that context

13   whether you were the first to say, at Purdue, to the

14   formulators, people like Ben Oshlack and John Minogue, let's

15   match the dissolution profile of MS Contin?

16   A.   I recall first saying that my interest was to get a certain

17   profile of blood levels that would result in a certain clinical

18   outcome.  And then there was discussion of how we might, or

19   where we might start in order to achieve that end.  And there

20   was discussion amongst us -- I don't know who first mentioned

21   it, but we talked about matching the profile, and it was

22   suggested that the place to start might be matching part of the

23   profile of MS Contin.

24        I matched on to the -- I, to me, my interest was, yes,

25   it's a reasonable place to start, but to me it's most important

1    that you match that initial part of the curve, because I was

2    interested in getting something that had certain things in

3    characteris -- in common with MS Contin that were things that

4    happened early on.  But I didn't want to -- I didn't want to

5    match the complete blood level profile among other things with

6    MS Contin.

7    Q.  Well, I'm speaking of the in vitro dissolution profile of

8    MS Contin.

9    A.  Yes.  We agreed that that would be a place to start.  I'm

10   not sure I was the first one to talk about matching, but when

11   it was brought up, I said, let's match -- you know, I was

12   interested in matching that.  And we agreed that that made

13   sense.  That made sense.

14   Q.  Do you know if any work was done on that, if matching,

15   mimicking the in vitro dissolution of MS Contin was done before

16   you arrived, in 1985, September of 1985, at Purdue?

17   A.  I hadn't become aware of that until litigation.

18   Q.  But you're aware of it now?

19   A.  Yes.

20   Q.  But whatever, let's not get bogged down in -- whatever the

21   starting point was, is my understanding correct that the

22   purpose at Purdue, yourself and Ben Oshlack and other people,

23   the purpose of mimicking the profile was to cut down the number

24   of iterations, the formulation, reformulation process, the

25   number of iterations to arrive at a workable formulation?  Is

1   that correct?

2   A.  Yes.

3   Q.  And would I be correct in stating that in this case, with

4   regard to oxycodone, there were no iterations; isn't that

5   correct?

6   A.  There were iterations in terms of the formulation

7   certainly.  Whether or not there were iterations in terms of

8   the matching the initial part of the profile, I mean, I think

9   they made a number of different experimental formulations

10  within a period of time.

11  Q.  Sir, isn't it true that with regard to the development of

12  OxyContin, that is, Acrocontin oxycodone, it was not an

13  iterative process; it was not a trial-and-error process; Purdue

14  was lucky because you hit it on the first trial?  Purdue was

15  very lucky and you hit it on the first trial.  Isn't that

16  correct?

17  A.  Purdue was lucky in the thought --

18  Q.  Isn't that correct, sir?

19  A.  In the term --

20  Q.  Is that correct, sir?

21  A.  Not as stated.  It's vague as stated and I'd like to say

22  that it's correct to the extent that the first formulation

23  brought in demand.

24  Q.  Purdue, and it's been your testimony, Purdue has been very

25  lucky in this case because there was no iterative process in

1    the development of Acrocontin oxycodone or OxyContin; isn't

2    that correct?

3    A.   That's correct.

4    Q.   You arrived at Purdue in September of 1985.   I think you

5    signed your employment agreement September 30, 1985.   Lawyers

6    get to know that stuff on cases like this.   But is that your

7    recollection?

8    A.   Yes.

9    Q.   And would I be also correct in stating that it is your

10   position, Dr. Kaiko, that you are the originator, you are the

11   driving force, you are the source and start of the project to

12   develop at Purdue controlled-release oxycodone?

13   A.   Yes.

14   Q.   Now, when you arrived at Purdue in 1985, did you in any way

15   attempt to familiarize yourself with the prior work of Ben

16   Oshlack and his colleagues at Purdue?

17   A.   No.

18   Q.   So you only realized today that in fact Oshlack and his

19   coworkers had already started, for example, to mimic MS Contin,

20   its profile, before you came to Purdue; isn't that correct?

21   A.   No.   I have no reason to believe that they ever tried to

22   mimic MS Contin before I arrived at Purdue.

23   Q.   So you haven't been shown any documents in this case that

24   were written by Ben Oshlack with regard to MS Contin and

25   mimicking its in vitro profile before the time you came?

363APUR3                    Kaiko - cross                    292

1    A.  I don't recall seeing it.

2    Q.  And you're aware that Mr. Oshlack will be called on behalf

3    of your company, Purdue, to testify as the next witness in this

4    case; are you aware of that?

5    A.  Yes.

6    Q.  He would be a good source to know what he did prior to the

7    time you came; wouldn't that be correct?

8    A.  Yes.

9    Q.  But whatever you did, I think I understand from your

10   testimony today that your contribution to the invention had to

11   do with the plasma oxycodone concentrations and times and the

12   reduction of the dosage range.  And that is, in other words,

13   quicker titration time.  Is that correct?

14   A.  And the rest of the clinical related information in the

15   patents.

16   Q.  Right.  By the way, how did you prove -- well, I think you

17   testified to this.  Prior to the filing of your application in

18   1992, you really had no proof, scientific proof, of any nature,

19   as to reduction in range, ease of titration; that's correct,

20   isn't it?

21   A.  Yes.

22   Q.  Now, you just mentioned, when I asked you your involvement,

23   you said "and in addition the clinical aspect of this."  And

24   that's the purpose of your original chart, Plaintiff's Exhibit

25   1064, which I have modified to be Defendant's Exhibit 4384.

363APUR5                          Kaiko - cross

1   Q.  Now we're back in the September 28th memorandum that you

2   wrote.  See it here.  It's Defendant's Exhibit 3629.  And on

3   the second page, you write, and your counsel focused in on a

4   few other paragraphs which I won't focus in on, but I would

5   like to focus in on a paragraph that your counsel didn't focus

6   in on, and that is the one that says, "I attach a copy of a

7   draft analysis."  And that analysis is attached to Defendant's

8   Exhibit 3629.  Do you see what it says there?  "I attach a copy

9   of a draft analysis plan for OC93-1001 in which Dr. Fitzmartin,

10  Mr. Thomas, Mr. Komorowski and I attempted to deal with these

11  issues; this is not meant to be either complete nor sufficient

12  (let's be positively creative)."  Do you see that?

13  A.  Yes.

14  Q.  Would I understand that at this point in time you are in

15  fact taking the lead in attempting to prove the primary claim

16  of ease of titration; isn't that so?

17  A.  No, I wouldn't say that.  What I was taking the lead in is

18  reviewing data from studies that were already completed or

19  planned for other purposes, designed to answer questions other

20  than this question, and seeing what we could find in fact in

21  those studies that was related to the invention, to see, in

22  addition to what the study was designed to do that was

23  consistent with the invention, such as the fluctuation and

24  variability in study 1001, but I never believed that I could

25  prove reduction in daily dose range on the basis of going back

363APUR5                    Kaiko - cross                    343

1   to these studies designed for other purposes.

2   Q.  Let's go on to Defendant's Exhibit 3739.  Now just stay

3   there one moment here.  3739 has on its face the distribution

4   list and all the people.  Is this generally the people who were

5   on the distribution list for the OxyContin project, like

6   yourself, Innaurato, Goldenheim, Grandy, Chasin, Oshlack?

7   A.  Those names you mentioned were among those who were usually

8   involved, yes.

9   Q.  And what we see here, though, is a mean entity if you will,

10  a different entity, a non-personal entity.  There's the IND/NDA

11  file.  Do you see that?

12  A.  Yes.

13  Q.  Were you familiar with that file at the time?

14  A.  No.

15  Q.  Have any reason why all of this, these internal memos, are

16  being sent to that file?

17  A.  No.

18  Q.  Can we go on to the next page, please.  Here is Dr. Reder,

19  OxyContin project team.  You were on that team, right?  And

20  this is May 3, 1994.  And what they're talking about is a

21  preliminary report on the OxyContin tablets investigator

22  survey.  OxyContin tablets, that's oral dose, right?

23  A.  Yes.

24  Q.  And OxyContin is your invention; isn't that correct?

25  A.  Yes.

363APUR5                        Kaiko - cross

1   Q.  And at least at this time it appears that you are the

2   leading promoter of the primary claim, ease of titration.

3   Doesn't that appear to be the case to you from these documents?

4   A.  That appears to be the case, yes.

5   Q.  And what does Dr. Reder report, at least preliminarily at

6   this time, May 3, 1994?  "OxyContin benefits included the

7   following:  Easier titration than Duragesic (but not MS Contin

8   or oxycodone IR)"?  Do you see that?  And it's the first on the

9   benefit list.  Do you see that?

10  A.  Yes.

11  Q.  Duragesic is the fentanyl patch?

12  A.  Yes.

13  Q.  Not an oral product?

14  A.  No.

15  Q.  So you had a benefit of ease of titration over a non-oral

16  product, correct?

17          Correct?  According to this report.  There's an easier

18  titration than the Duragesic fentanyl patch.

19  A.  Yes.

20  Q.  But not the oral products, like MS Contin.  Correct?

21  A.  That's what it says.

22  Q.  OK.  How about oxycodone?  Is that an oral product?

23  A.  Yes.

24  Q.  Now, let's go to the '331 patent application.

25  A.  Could I just complete my answer for a moment?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

363APUR5                     Kaiko - cross

1    Q.  Answer to what?

2    A.  The question.  That's what it says there, but you have to

3    appreciate, these are 11 doctors who have very limited

4    experience with OxyContin.  It's a documented anecdote of a

5    very small number of people.

6    Q.  So at least at this point in time you were very much

7    interested in proving the primary claim, and the preliminary

8    indication was against the primary claim, but you believe that

9    the indication wasn't important because of the small number of

10   doctors who were surveyed?

11   A.  This is -- this opinion of 11 doctors with limited

12   experience with OxyContin, it doesn't prove or disprove

13   anything.  It's not -- when I saw this memo, you know, frankly

14   I had to chuckle to a certain extent, because this is not a

15   way -- this type of survey is not a way of answering a

16   question.

17   Q.  OK.  But you know this document pretty well, don't you,

18   because if we go to the second page -- let's go to the second

19   page of this document.  And let's go down to the fifth

20   paragraph down, maybe the first three or four lines, please,

21   Molly.

22           You know this well enough to know exactly the number

23   of doctors that were surveyed, and you probably know it well

24   enough to know that 0 out of 11 felt it was easier to titrate

25   than MS Contin, and 1 out of 11 felt it was easier to titrate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

363APUR5                      Kaiko - cross                          346

1    than oxycodone IR tablets.

2             MR. FILARDI:  No, it's the first three lines.  OK.

3    Q.  I'm sorry to be distracting you with that, but you see

4    that, right?  This is 0 out of 11?

5    A.  I see what that is.  And this is not science.

6    Q.  And this is 1994, right?

7    A.  Yes.

8    Q.  So if we can gather up whatever we've learned at this

9    point, 1994 in time, you've already filed your patent

10   application on the invention in November of 1992, correct?

11   A.  Yes.

12   Q.  And based upon your intuitive knowledge at the time, you

13   said that -- whatever you said about the invention, that part

14   of the investigation was a reduction in range, ease of

15   titration, correct?

16   A.  Part of the invention was reduction to range, reduction in

17   range.

18   Q.  OK.  We'll go back and see the exact language that you used

19   in the course of time.  But I want to just get fixed in our

20   minds that as of '94, you were attempting to prove the primary

21   claim.  You thought it was imperative, but your early

22   indications were that it may not be true.  Fair?

23   A.  No.  Unfair.  Wrong.  Where we designed studies to look at

24   tendencies of the invention, we found data consistently

25   consistent with the invention.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

363APUR5                      Kaiko - cross                         347

1    Q.  Did that occur, start any time prior to 1997?

2    A.  Yes.

3    Q.  And were those data, were those reports submitted to the

4    FDA?

5    A.  They were consistent with the invention.

6    Q.  Were those reports that were consistent with the invention

7    that is surprisingly found and proven for OxyContin over MS

8    Contin, were they submitted to the FDA?

9    A.  That -- I think most of what we -- much of what we did was

10   submitted to the FDA.  We don't --

11   Q.  And if it was submitted to the FDA --

12   A.  There are some things that we don't submit to the FDA.

13   Q.  I'm sorry.  Are you finished, sir?  Forgive me.  I

14   interrupted you.

15   A.  Yes.  Yes.

16   Q.  I apologize.  OK.  My point is, to the extent these

17   documents exist, would they be in the files of Purdue?

18   A.  I don't know that they all would be.

19   Q.  Where would they be, if not in the files of Purdue?

20   A.  Not everything we did we saved.

21   Q.  OK.  So some things have been destroyed.

22   A.  Most likely.

23   Q.  OK.  Now, of this portion of the documents which support

24   the primary claim that survived destruction, do you know

25   whether those documents, from the files of Purdue, were sent to

1    the FDA?

2    A.   I know that some were.

3    Q.   And do you know of any reason why those documents have not

4    surfaced in this case?

5    A.   They have surfaced in this case.

6    Q.   And your counsel will point them out if they exist.  Do you

7    think that's a reasonable assumption, prediction, what might

8    happen on redirect examination?

9    A.   I don't know, sir.

10   Q.   OK.  Now, let me ask you this.  Were any of those materials

11   that supported -- demonstrated that the primary claim was true,

12   were they submitted to the U.S. Patent Office at any time?

13   A.   What we had observed was not --

14   Q.   No, I'm not asking about "observed."  I want to know about

15   the studies that you did or the evidence that you had that

16   supported the primary claim ease of titration.  Were they

17   submitted, in any form -- oral, written -- to the U.S. Patent

18   Office?

19   A.   No.

20   Q.   Let's go back to the '331 patent.  I would like to get that

21   up.  I think it's 2044.  Now, you are not an inventor on this

22   patent, but during the course of prosecution in this case, do

23   you recall that the claims of Oshlack and his co-inventors were

24   rejected in view of the '598 patent and the '341 patent?

25   A.   Yes.

363rpur6                        Kaiko - cross                        364

1    of direct.

2            MR. FILARDI:  Could we get Defendant's Exhibit 2049,

3    the patent.  Specifically, column 5, lines 5 to 15.

4    Q.  I would like to parse through this paragraph a little bit.

5    Your counsel directed you, I believe, to the second part of

6    this, but I would like to take the whole paragraph.

7            "In order to obtain a controlled-release drug dosage

8    form having at least a 12 hour therapeutic effect, it is usual

9    in the pharmaceutical art to produce a formulation that gives a

10   peak plasma level of the drug between about 4-8 hours after

11   administration (in a single dose study)."

12           Do you see that?

13   A.  Yes.

14   Q.  Were you aware at that time that there were several drugs,

15   formulations, controlled-release drug dosage formulations for

16   moderate to strong opioid analgesics that in fact achieved a

17   peak plasma level of between 2 to 4 hours for a 12-hour drug

18   prior to the time this statement was made by you and your

19   colleagues, co-inventors, in November of 1992?

20   A.  Other than MS Contin, I was aware of another 12-hour

21   release morphine product that was being characterized as having

22   an ideal pharmacokinetic profile for 12-hourly oral

23   controlled-release opioid for moderate to severe pain --

24   Q.  Let's see if we can take this --

25           MS. LORING:  Your Honor, he hasn't completed his

1    answer.

2    A.   -- and that had a Tmax that was between 4 and 8 hours.  I

3    think the only other one I was familiar with was the twice-a-

4    day hydromorphone product that is in that category of drugs

5    that you had made reference to.  So that is what I was aware of

6    at the time.

7    Q.   Did you have a hand in writing or giving input to the

8    writing of this particular representation to the patent office

9    and communicating to the patent office that it is usual in the

10   pharmaceutical art prior to your invention that to produce a

11   formulation that gives you a 12-hour drug, you've got to have a

12   peak plasma level of drug between 4 and 8 hours?  Was that you

13   who gave that information to the patent lawyers?

14   A.   When I received the draft patent, I discussed various

15   portions of it with outside patent counsel, and changes were

16   made, including changes in this section.  I recall how people

17   felt about the early peak that MS Contin had.  I knew what the

18   conventional wisdom was at the time regarding the desire, the

19   goal of the flattest curve possible for controlled-release drug

20   for moderate to severe pain.  And I revised this.  I had input

21   to this.  Parts I agreed with, parts I didn't, and it reflects

22   my position as it is written today.

23   Q.   This is my question.  Doesn't that communicate to the

24   patent office that for a twice-a-day drug, twice-a-day daily

25   drugs --

363rpur6                    Kaiko - cross                                        366

1   A.   Yes.

2   Q.   -- in other words, at least 12-hour therapeutic effect,

3   that in the past there was a 4- to 8-hour peak level for plasma

4   and that was usual, isn't that correct?  Isn't that what you

5   are communicating in the application?

6   A.   In the art, the goal, the conventional wisdom within the

7   art was to produce a flat curve with a peak in the mid range of

8   that curve.  The products that I had been aware of included

9   products that met that goal, and that is what people considered

10  the appropriate product for the art to develop.

11  Q.   That was something in the 4- to 8-hour range, isn't that

12  correct?

13  A.   Yes.

14  Q.   Is it not a fact that as of the time of the filing of this

15  application for the '912 patent and the other patents in suit,

16  you were in fact aware that CR morphine, controlled-release

17  morphine, in fact had a 2- to 4-hour Tmax, and that was for MS

18  Contin, isn't that correct?

19  A.   Yes.

20  Q.   You in fact coauthored an article in 1986 showing that MS

21  morphine had a 2 to 4 to give a 12-hour twice-a-day drug, isn't

22  that correct?

23  A.   Yes.

24  Q.   Would it have been fair to point that out to the examiner

25  at this time, that the closest commercial piece of prior art,

1    MS Contin, against which you did a lot of studies and

2    comparisons, had the same profile:  It was 2 to 4 and gave a

3    12-hour twice-a-day drug?

4    A.   I disagree.  We were very disappointed in MS Contin not

5    having the sufficient data to support a 12-hour duration claim

6    alone, that the drug couldn't perform in most all patients when

7    dosed appropriately every 12 hours, requiring that some

8    patients be dosed much more frequently.

9    Q.   That is not what you wrote in 1986, is it?  It is not what

10   you wrote when your company was promoting MS Contin, was it?

11   A.   We promoted that the majority of patients can have their

12   pain controlled with every 12 hour dosing with MS Contin, and

13   that is the truth and that is not inconsistent with what I just

14   said.

15   Q.   But you described it in your publication -- could we have

16   DX2766 -- as a 2 to 4 rather than an 8, isn't that correct?

17   A.   Oh, yes.

18            THE COURT:  For Tmax?

19   Q.   For Tmax?

20   A.   Yes.

21   Q.   I don't think we need that then.

22            Let's go on to the controlled-release codeine.  Isn't

23   it a fact that you knew Tmax was 2 to 4 for controlled-release

24   codeine as early as 1988, several years before the 1992

25   representation in your patent?  Isn't that correct?

363rpur6                           Kaiko - cross

1   A.   MS Contin is --

2   Q.   I am not talking about MS Contin.   I am talking about CR

3   codeine, controlled-release codeine.

4   A.   That is not appropriate for moderate to severe pain.

5   Q.   I'm sorry.   Forgive me.   I missed what you said.   It is not

6   appropriate for?

7   A.   I don't think that falls within the group of drugs where

8   you first asked the question and characterized them as drugs

9   for moderate to severe pain.   That does not fall within those.

10  Q.   Let's take a look at what you wrote in your patent

11  application.

12          MR. FILARDI:   Can we go back to the patent

13  application, please, column 5, 5 to 15.   DX-2049, column 5,

14  lines 5 to 15.

15  Q.   Here you don't make a distinction based upon level of pain,

16  do you.   You say, in order to obtain a controlled-release drug

17  dosage form having a 12 hour, it is usual in the pharmaceutical

18  art to produce a formulation that gives a peak plasma level,

19  Tmax, of 4 to 8 after administration.   It says nothing about

20  moderate to strong pain or anything like that.

21  A.   Elsewhere in the specifications I make it clear that we are

22  talking about drugs for moderate to severe pain, and I list

23  several candidates, and codeine is not among them.

24  Q.   Certainly not in this paragraph with regard to that

25  representation, isn't that correct?

363rpur6                        Kaiko - cross                        369

1    A.   That's correct.

2    Q.   But you knew more at that time in November of 1992, because

3    you knew that controlled-release hydromorphone --

4            MR. FILARDI:   Could we get Defendant's Exhibit 3282,

5    please, at page 309298.

6    Q.   Here is a final clinical report, correct, that you signed,

7    which shows this drug, controlled-release hydromorphone, as

8    having a Tmax between 2 to 4, isn't that correct?  You knew

9    about that?

10   A.   Yes.

11   Q.   You knew that in 1988, isn't that correct?  1988.  Yes, I

12   represent to you it is 1988.  And you knew more than that.  You

13   knew with regard to controlled-release dihydrocodeine of the

14   '984 patent, that it in fact was another drug that had a Tmax

15   of 2 to 4, well prior to your patent disclosure, isn't that

16   correct?

17   A.   Another drug for more moderate pain, a drug I hadn't had

18   any clinical experience with in terms of these studies, wasn't

19   in my mind as I was thinking about this.

20   Q.   But, Dr. Kaiko, you were filing an application claiming a

21   controlled-release opioid for oxycodone, right?

22   A.   Yes.

23   Q.   Didn't you look back into the prior art disclosures with

24   regard to the same type of formulations, controlled-release

25   opioid analgesic formulations?  That is right into the area of

370

363rpur6                          Kaiko - cross

1    the subject matter of this patent.  You didn't think to mention

2    that to the patent office?

3    A.  I was familiar with most all of these formulations.

4    Q.  Did you tell your lawyers?

5    A.  My lawyers appreciated this as well.

6            THE COURT:  Is this an appropriate time to end, sir?

7            MR. FILARDI:  It is, your Honor.

8            THE COURT:  Why don't we break now.  We will pick it

9    up tomorrow at 11:00 a.m.  Thank you.

10           (Adjourned to June 4, 2003, at 11:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

364APUR1

1    phone.

2            What about the alternative?

3            MR. SCHWARTZ:  Video link.

4            THE COURT:  A video feed that can be -- I know at 40

5    Foley Square they have the facilities for that.  I don't know

6    at the other end; that may be the issue.

7            MR. SCHWARTZ:  That's what I would suggest, your

8    Honor, that we do it with a video feed.  I've heard of that

9    being done before and I've been involved in it myself.

10           THE COURT:  Since you are asking to have me review the

11   video, it's not as if I were reading the transcript and can do

12   it in a shorter period of time.  Since it is in real time, it

13   would take the exact same time for me to view it as it would

14   for you to take it.  Thinking it through, then there's a

15   problem, because the reason I'm not having trial on Friday is

16   because I have other cases.

17           MR. SCHWARTZ:  If we had a video feed we could it in

18   regular trial time any day, Wednesday, Thursday.

19           THE COURT:  Yes, but doing it at a time when I could

20   otherwise see you, short as the trial, from the standpoint of

21   the last day of trial.  In other words, I can watch it on a

22   Saturday or Sunday.

23           Work it out, and if you want to do it on a video feed,

24   we'll just have to arrange it at a time when I can be watching.

25           And I guess the video feed only has to be one way.

364APUR1

1    That may make it easier.  I need an audio feed the other way,

2    but I just need a video feed to me.

3            See if you can work it out.

4            MR. SCHWARTZ:  OK.  We'll try.

5            THE COURT:  All right.  Proceed.

6            MR. FILARDI:  All right.  Thank you.

7    CROSS EXAMINATION

8    BY MR. FILARDI:

9    Q.  Good morning, Dr. Kaiko.

10   A.  Good morning.

11   Q.  Let me see if we can pick up where we left off yesterday.

12           MR. FILARDI:  Can you get on the screen the '912

13   patent, Defendant's Exhibit 0249, particularly the column, the

14   language that we were discussing in column 5, line 5.

15   Q.  Do you recall our focus toward the end of the day,

16   yesterday, was on the, if you will, the T max and the prior art

17   at 4 to 8, whereas with the invention it was 2 to 4.  Do you

18   recall that?

19   A.  Yes.

20   Q.  And if I recall your testimony --

21   A.  Oh, I'm sorry, no.  It's 2 to 4 1/2, sir.

22   Q.  OK.  When you say 2 to 4 1/2, there would be some overlap

23   actually between what you found and in the prior art, because

24   within the 4.5, 4 1/2 hours and 4, there was an overlap with

25   the prior art.  Isn't that correct?

364APUR1                    Kaiko - cross

1    A.  Yes.

2    Q.  And that 4 1/2 appears in claims, doesn't it?

3    A.  Yes.

4    Q.  And that portion is actually a capturing of the prior art,

5    at least in that portion of the claim; isn't that correct?

6    A.  I can see how you can say that to some extent.

7    Q.  Now, yesterday, if I recall correctly, you testified that

8    as of the time of filing, writing this paragraph to the patent

9    office, you were aware that there were several

10   controlled-release opioid analgesic formulations that actually

11   were characterized by a T max of 2 to 4; isn't that correct?

12   A.  Yes.

13   Q.  And those included controlled-release codeine.  Do you

14   recall that?

15   A.  Yes.

16   Q.  And you were aware of that at the time.  And it also

17   included controlled-release hydromorphone; isn't that correct?

18   A.  Yes.

19   Q.  And controlled-release dihydrocodeine, the 984 patent.

20   Isn't that correct?

21   A.  Yes.

22   Q.  And then also controlled-release morphine, the MS Contin,

23   you were aware that that had a T max of 2 to 4 in the prior

24   art; isn't that correct?

25   A.  Yes.

364APUR1                    Kaiko - cross

1    Q.  And significantly, the 2 to 4 of the morphine was contained

2    in quite a bit of literature, the description of it, quite a

3    bit of literature of the Purdue Company, your company, isn't

4    that correct, prior to November of 1992?  Isn't that correct?

5    A.  Yes.

6    Q.  I would like to show you an exhibit that has been marked as

7    Defendant's Exhibit 3260.  I believe it's in the book that is

8    in front of you, but I will get it up on the screen.  Maybe you

9    are familiar with this.  Are you familiar with literature like

10   this, where MS Contin was promoted?

11   A.  Yes.

12   Q.  And if you were to turn to the second page of Defendant's

13   Exhibit 3260, you would see that it's promoted as a 12-hour

14   drug; isn't that correct?  Prominently promoted as a 12-hour

15   drug.

16             MR. FILARDI:  It would be down at the bottom of the

17   page.

18   Q.  Isn't that correct?

19   A.  It was promoted primarily as a 12-hour drug, yes.

20   Q.  And this brochure is well prior to November of 1992, isn't

21   it, sir?

22   A.  Yes.

23   Q.  This is roughly a mid 1980's brochure; is that not correct?

24   A.  Yes.  Also in here is acknowledgement that it's also

25   indicated for every 8-hour dosing.

364APUR1                    Kaiko - cross

1   Q.  So it's indicated for both 12 hours and 8 hours depending

2   upon how you administer it?

3   A.  No.  It depends on whether or not the patient can be

4   controlled every 12 hours or not.

5   Q.  Let's go to the next page.  It has P-041767 down at the

6   bottom.  Do you see that page?

7   A.  Yes.

8   Q.  And that would indicate clearly that MS Contin has a T max

9   of 2.7.  Isn't that correct?

10  A.  Yes.

11  Q.  What is Roxanol SR tablets?

12  A.  That is a controlled-release oral morphine formulation that

13  differs somewhat from MS Contin.

14  Q.  That also has, that drug also has a T max of between 2 and

15  4 hours; isn't that correct?

16  A.  Yes, but its efficacy dynamics are quite different.

17  Q.  It falls within the general purview of an opioid analgesic

18  in the prior art controlled-release formulation?

19  A.  In a general sense, but it's not as potent, and its onset

20  of analgesia is significantly different from that of MS Contin.

21  Q.  You also mentioned yesterday during the course of your

22  testimony that one of your contributions is to focus in on

23  early peak T max for oxycodone?

24  A.  I wanted to have an early peaky profile, yes.

25  Q.  Can you turn to page 041769, take a look at what in the mid

364APUR1                         Kaiko - cross

1    1980's your company was showing as the curve for the MS Contin

2    tablet.  Wouldn't you say that's pretty peaky?

3    A.  Yes.

4    Q.  Tell me about this MEAC, the minimally effective analgesic

5    concentration.  Would I be correct that this graph indicates,

6    to anyone who sees it, anyone who reads it at the time, that

7    roughly the MEAC, the minimally effective analgesic

8    concentration, for MS Contin was approaching, was a little less

9    than 15.  Can we call that 14?

10   A.  I wouldn't say that, no.

11   Q.  And what would you say?  What does this graph tell you

12   about the MEAC?

13   A.  It's in the context of the whole document such as the

14   previous page.  It's laid out there that MEAC was arrived at,

15   and what illustrates it are the results from eight different

16   studies utilizing variously different ways of getting in

17   testament of MEAC and winding up with a threefold difference

18   from about 6 to about 20 nanograms per ML.

19            So to say that the MEAC is 14, I think, is

20   mischaracterization of the MEAC in the context of the whole

21   document.

22   Q.  In the context of this entire document, in the mid 1980's,

23   did you, sir, have an understanding that oxycodone at that

24   point in time was about twice as potent as MS Contin?

25   A.  Yes.

364APUR1                    Kaiko - cross

1    asking to have any idea of whether that might be generally

2    high, low, or right.  Nor do I have the statistical skills to

3    calculate the power of the study.

4    Q.  Would you please now turn your attention to Defendant's

5    Exhibit 4355.  By the way, this -- I'll just, I'll continue.

6         4355, here again it's another portion of the Kalso

7    study.  Is that correct?

8    A.  Yes.

9    Q.  Submitted to the FDA.  Correct?

10   A.  I don't know.

11   Q.  I see on the second page there's your name but there's no

12   signature.  Do you recall whether in fact this document was

13   signed and submitted to the FDA?

14   A.  I don't know.

15   Q.  Look at the first page of the document, 642906.  Do the

16   dates there generally indicate -- are they accurate to your

17   recollection as the start date, the end date, and the study

18   report date?  And I'll read those dates and ask you whether

19   they are consistent with your recollection of the timing of the

20   Kalso report submitted to the FDA.  Start date February 22,

21   1994; end date May 16, 1995; study report date July 29, 1996.

22   Correct?

23   A.  Maybe you misspoke or I misunderstood you, but the report

24   date didn't start and end under those dates.  They're the study

25   dates.  Those are the study dates, the time that the first

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

364APUR1                    Kaiko - cross

1    patient was dosed and the last patient was dosed.

2    Q.  OK.  Thank you very much.  This is work that was sponsored

3    by your company, Purdue?

4    A.  Yes.

5    Q.  And Purdue selected the investigator, Kalso?

6    A.  Yes.

7    Q.  For the study.  And did your company receive regular

8    reports as to the progress of the study as it proceeded?

9    A.  Yes.

10   Q.  Could you please turn to page 642954.  Would I be correct

11   in stating that that page identifies as a primary efficacy

12   variable of the study, quote, time to achieve stable pain

13   management, end quote?

14   A.  Yes.  But that doesn't say the study was designed to

15   determine whether or not there's a difference between

16   treatments in that regard, as I had probably said to you many

17   times already.

18   Q.  Are you finished, sir?

19   A.  Yes.

20   Q.  OK.  Could you please now turn to page 642793.  Under the

21   heading "time to achieve stable dosing," would you turn to the

22   last sentence.  It says, "The median time to stable dosing was

23   three days for CR oxycodone and 1.5 days for CR morphine.

24   There was no significant difference in the time to achieve

25   stable pain control."  My question is, were you aware of that

364APUR1                          Kaiko - cross

1    statement as of August 18, 1996?

2    A.  Yes.

3    Q.  Did you make any recommendation to your patent counsel in

4    connection with then pending applications for the patent in

5    suit that that information be disclosed to the patent office?

6    A.  No.

7    Q.  Could you go to the next page.  I'm sorry.  It's not the

8    next page.  It's the page that bears production number 642994,

9    page 89 of this exhibit number Defendant's 4355.  Do you see

10   this is the conclusions page; is that correct?

11   A.  I'm sorry.  What page are you on again?

12   Q.  642994.

13   A.  Yes.

14   Q.  Under the heading 8.2, the conclusions are reached as to

15   the efficacy of OxyContin versus MS morphine.  Is that correct?

16   A.  Yes.

17   Q.  And in there, the third line down, and I read to you, and

18   it reads, quote, In the titration period there were no

19   significant differences between CR oxycodone and CR morphine

20   treatment groups with respect to the number of days required to

21   achieve stable pain control.  Did I read that correctly?

22   A.  Yes.

23   Q.  And as of this time, August 16, 1996, you were aware of

24   that conclusion being reached?

25   A.  Yes.  But that's in the context of study, where a

364APUR1                    Kaiko - cross

1    knowledgeable reader will recognize a study is not designed to

2    determine whether that's the case or not.  A study is not

3    determined to prove or disprove that.  What the study was in

4    fact designed to do, it obtained information that was

5    consistent with the patent.

6    Q.  And this information was given to the FDA?

7    A.  Yes.

8    Q.  And this information was not given to the patent office?

9    A.  Correct.

10   Q.  I turn your attention now to Defendant's Exhibit 4359 --

11   we've already done that.  Can we jump over to 4371.

12          MR. FILARDI:  Your Honor, this is my last exhibit.  I

13   know it's ten after 1.  Would you like me to conclude?  I can

14   conclude.

15          THE COURT:  I would like you to finish -- if you're

16   able to finish the cross, then I think you should --

17          MR. FILARDI:  I'm going to --

18          THE COURT:  -- take the time you need, and when you're

19   done, cross will be finished.

20   Q.  Defendant's Exhibit 4371.  Do you know what this document

21   is?

22   A.  This looks like a document to a regulatory body other than

23   the FDA.  Which regulatory body that -- a non-U.S. regulatory

24   body other than the FDA, other than one in the U.S.A.  But I

25   don't know what country it is.

364APUR1                    Kaiko - cross

1   Q.  And this was submitted to whatever body it was submitted to

2   in 1996?

3   A.  There's a June 16, 1997 date on the lower bottom of the

4   page I'm looking at.

5   Q.  I'm sorry.  June 1997.  Correct.  I agree.  And was it

6   submitted on or about that time?

7   A.  I don't know when it was submitted.  I'm reading the dates

8   off a piece of paper.

9   Q.  Could you turn now to the last exhibit, Defendant's Exhibit

10  4145?

11  A.  Yes.

12  Q.  That is in fact a publication for peer review of the Kalso

13  study.  Is that not correct?

14  A.  Yes.  There were more than -- this is not the only

15  publication.  There was a second mentioned publication as well,

16  of the Kalso study, by the same authors.

17  Q.  OK.

18          MR. FILARDI:  Your Honor, except for offering some

19  exhibits, which I would ask if I could have the lunchtime to

20  gather up those exhibits so we could read them into the record

21  for admission, but I do have one, a document which was handed

22  to me, about the Sunshine study.  I don't have copies of it,

23  but there was an issue as to date.  If I may do this.  I don't

24  have copies, but I would like to put it on the screen.

25          Defendant's Exhibit 3924.